UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-61329-CV-BLOOM
CASE NO. 14-60195-CR-BLOOM
MAGISTRATE JUDGE REID

WENXIA MAN,

     Movant,

v.

UNITED STATES OF AMERICA,

     Respondent.

_____/

## REPORT OF MAGISTRATE JUDGE

### I.    Introduction

The *pro se* movant, **Wenxia Man** ("Movant"), has filed this motion to vacate, pursuant to 28 U.S.C. § 2255, attacking the constitutionality of her conviction and sentence for conspiracy to commit offenses against the United States, entered following a jury verdict in Case No. 14-60195-CR-BLOOM. For the reasons set forth below, the Movant is not entitled to relief.

This Cause has been referred to the undersigned for consideration and report pursuant to 28 U.S.C. § 636(b)(1)(B), (C); S.D. Fla. Admin. Order 2019-02; and Rules 8 and 10 Governing Section 2255 cases in the United States District Courts.

## II.    Claims

Construing the § 2255 motion liberally as afforded *pro se* litigants, pursuant to *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972), Movant raises the following grounds for relief:

1.    She received ineffective assistance of trial and appellate counsel when they consented to truncated emails presented to the jury and failed to impeach government witness Matthew McCauley. [ECF No. 1 at 5].

2.    She received ineffective assistance of counsel when her lawyer failed to highlight certain mistranslations and omissions to the jury [ECF No. 1 at 6].

3.    She received ineffective assistance of counsel when her lawyer failed to ask relevant questions of the defense witnesses to show her propensity for being easily duped. [ECF No. 1 at 8].

4.    She received ineffective assistance of counsel when her lawyer agreed with the prosecutor to not show exculpatory evidence to the jury. [ECF No. 1 at 9].

## III.    Procedural Background

A. <u>Superseding Indictment</u>

Movant was charged by superseding indictment with a single count of conspiracy to commit offenses against the United States, that is, to export and cause the export of defense articles without having first obtained a license or approval from the United States Department of State, in violation of 22 U.S.C. § 2778 (Count 1). [CR-ECF No. 93].

2

B. <u>Facts Adduced at Trial</u>

In Movant's direct appeal, the Eleventh Circuit summarized the facts presented at trial as follows:

> Wenxia Man is a resident and citizen of the United States who was born in China. She and her husband owned a company that produced electronic components for military applications. But her interest in military hardware went beyond this legitimate business.

> On February 27, 2011, Man received an email from an account with the name "hrkj2006" that asked her about engines used in military aircraft. The email read as follows:

>> Inquiry. Hi, Sister. Can you check if you are able to find the following [aircraft engines]: Manufacturer Lockheed Martin, Model 1, F100 Pratt & Whitney 229 or F110 General Electric 129. Two, F119 Pratt & Whitney 100 or F119 Pratt & Whitney 119, three pieces each.

> Two days later, Man inquired about these engines in an email to Matthew McCauley, who worked for an international electronic sales company that distributed capacitors manufactured by Man's company. McCauley responded that he could "get [her] the[ ] engines, but [her] customer w[ould] need to pick them up in the United States." Man sent a reply email that provided a revised list of engines. She also stated in the email that, "[i]f there [was] any export problem, [they would] have to give up."

> McCauley reported this exchange to the Department of Homeland Security. At the direction of the Department, McCauley emailed Man on September 13, 2012. He told her he had located a seller who would allow Man's "customer [to] pick up the engines outside the United States." Man replied that she was "glad to hear from [McCauley]" and would speak with her customer. The next day, Man confirmed to McCauley that her "customer ... still need[ed] th[e] engine[s]," and she asked if "it [was] possible to [ship the engines to] Hong Kong."

> Man later gave McCauley more information about the nature and purpose of her inquiries. She informed him that the Chinese

government would provide the money for the sale, that her customer had "made similar transaction[s] with Russia," and that she would receive a "commission" when the deal closed. But she refused to give McCauley additional details because "the procedure [was] very complicated and risky." And when Man asked McCauley for additional information about the seller—including whether "he [was] Chinese"—she stressed that McCauley "need[ed] to make [sure that] the seller is not from [the Federal Bureau of Investigation] because ... sometimes the [Bureau] officer[s] disguise[ ] [themselves as] seller[s] to find spy activities."

The "seller," Jerry Liu, was an undercover agent with the Department of Homeland Security. McCauley provided Man with Liu's phone number on September 20, 2012, and Man called Liu "within a few hours." After Liu confirmed to Man that he was "Chinese," Man explained that she was looking for military engines.

Man and Liu discussed legal obstacles to the export of the engines. Liu informed Man that he "[u]sually ... need[ed] a license to send [the engines] outside" of the country and that a license for export to China "might be a little difficult." He also told her that she should "try to get a license first," but that "[i]f [that] doesn't work, then [they could] talk." Man quickly responded that she would "not get this license." She explained that the "[United States] prohibits sending [these kinds of engines] to China" and that this barrier was why her "friends in mainland China" "need[ed] [her] to do it." Liu then proposed sending the engines "to a third country[,] and then from [there], selling abroad to China." Man agreed to this plan after underscoring that "[n]o mistake[s] [were] allowed."

Man provided Liu with the name of her customer, Xingsheng Zhang, and Zhang's phone number and email address. She explained to Liu that she "was introduced [to Zhang] through another friend who smuggles arms to China." Man also reiterated that her clients were "scared of any mistake," and Liu confirmed that "[they] would be in trouble" "[i]f [they] found the wrong person." And she reminded Liu that they had "to be very careful" because "any mistakes" would be "[v]ery troublesome."

Man's fears of legal trouble reemerged in later conversations between her and Liu. For example, she told Liu that, "if there were no embargo

..., [her clients] would not need ... [their] help." She also explained that she and McCauley "stopped" their earlier dealings because she "really [didn't] want to touch anything that is in violation of the law" and "[didn't] have any solution" for "get[ting] [the engines] out of the [United States]." Despite these concerns, Man and Liu continued to discuss the price of the engines, how to ship through a third-party country, and Man's "commission" for the sale.

Liu then sent an email in English to Zhang, Man's customer. He did not copy Man on the email, so he called her to ask whether Zhang could understand English. Man informed Liu that Zhang had received the email but that "[h]is English [was] not good." Man also told Liu that Zhang had additional technical questions about the engines, and Liu promised to call Zhang shortly. Man suggested that Liu should try to call in the morning because of Zhang's schedule. And she again expressed concern about how to "hide" the engines and "get them out" of the country. In the light of these difficulties, she told Liu that Zhang might be satisfied with the "technical materials" instead of the engines.

After Zhang confirmed that he was interested in the technical "drawings and information" for the engines, Man and Liu discussed financial terms, Man's "profit," and how to ship through a third-party country. In one conversation, Man suggested that she thought that "shipping to a third country instead of shipping directly to China" was "legal." But Liu replied that he had done "research" and found that "ship[ment] ... to China is totally illegal" and that "ship[ping] this stuff to China is a violation of the law." He also explained that his "agent" would "require some payment in order to protect himself" because he would be "taking [a] risk." Man again suggested that a third-party shipment would be "legal." But she then rejected Liu's suggestion that she handle the transaction through her corporate bank account because "[a] deposit of a large sum is troublesome." She also instructed Liu not to tell his supplier that the engines are "going to China" and that "the information that this stuff is shipping to China should stop with [him]" "[b]ecause there are many federal agents investigating." And she agreed with Liu that they were "tak[ing] on the highest risk" because they "live[d] in the [United States]." Finally, she directed Liu to not "get [her] involved" "[i]f [he] g[o]t caught."

Man also provided Liu with additional detailed information about Zhang. Man explained that Zhang was "working for the Chinese

military[,] sort of like a tech spy," and that he was "trying to find [advanced technology] to provide shortcuts for our country." She also told Liu that Zhang worked for the "China National Aviation Corporation" and that she was hoping to expand her legitimate electronics business into China through Zhang.

Later communications between Liu and the individual conspirators followed the same pattern. Liu and Zhang would discuss the engines, technical data, pricing, and shipment details, and Liu then would call Man to update her and to discuss prices, her compensation, and the legal risks of their plan. Liu also emailed Man a "business plan" that specified that the engine "distributor will not know the final destination of the engines" and that "the buyer will not know the identity of the ... distributor." Liu and Man later discussed this "business plan" and the technical details of the engines over the phone.

Man and Zhang also expressed strong interest in military hardware other than the engines. At one point, Man informed Liu that Zhang "need[ed] material information [about a] drone aircraft." Liu then spoke with Zhang, who confirmed that he wanted "the most advanced" "drone aircraft." After Liu again spoke to Man, he informed Zhang that he could procure a MQ-9 Reaper drone, but that shipment to China was "totally prohibited" and "a crime in the [United States]." Zhang responded that he would "think about other means" to get the drone.

Liu reported this conversation to Man and asked her to assist in translating technical information. He also confirmed Man's belief that the drone was "prohibited for export to China." Despite this obstacle, Man confirmed that her buyer was interested in obtaining both the actual drone and its "software" and "mathematical model." Man explained that the software was necessary to "modify" the drone because, if China produced an "identical" drone, "people would know right away that [they] stole it, which is not allowed."

Liu next emailed Zhang a "false flight schematic" for the drone, and Zhang demanded additional data. Liu also sent the fake schematic to Man. He later called her to review the schematic and told her that, "by [his] sending out this page," "all of [them] [had] ... committed a crime."

Man and Liu also discussed purchasing a military decoy aircraft manufactured in Sweden. In a phone call, Man explained that Zhang

6

was interested in "buying or getting a quote for something like [the decoy]," and she sent a follow-up email with the specific items sought by Zhang. Man and Liu again spoke over the phone, and Liu stated that he would "try to contact people [he] kn[e]w in Europe to see if they [had] any contact with th[e] [manufacturer]." Man also suggested that Liu "could try calling" Zhang about the decoy, and she recommended that Liu do so "in the morning [because Zhang] ... is a night owl." Man and Liu also discussed having Man's "company sponsor [Zhang] so he could come [to the United States]."

The sale never occurred. Zhang expressed concerns about how quickly Liu could procure the goods, about whether Liu could provide full information about the drone, and about the price of the drone. Liu and Man discussed these obstacles and payment terms, and Man suggested that she would attempt to persuade Zhang to close the deal. She also discussed using "her company to sponsor either ... Zhang or [an] engineer[ ] to come over on [a] visa [and] examine th[e] documents," even though she thought that viewing the documents was "illegal." And she told Liu that Zhang "was hesitant to talk much over the phone [because] phone calls in the [United States] are under surveillance." She also expressed her own concerns about the deal and explained that she had "lost so much money." Finally, on June 20, 2013, Zhang told Liu that, although he was "eager[ ]" to make the deal, he was unconvinced that Liu could "deliver" and that the sale was off. Liu arranged to meet Man in person on September 1, 2015, and federal agents arrested Man at the meeting.

*United States v. Wenxia Man*, 891 F.3d 1253, 1260-63 (11th Cir. 2018).

C. <u>Sentencing</u>

After litigation not relevant to the claims raised in this motion to vacate, the Court sentenced Movant to 50 months' imprisonment, to be followed by two years of supervised release. [CR-ECF No. 143].

D. <u>Direct Appeal</u>

Movant prosecuted a direct appeal raising the following issues: (1) "whether sufficient evidence supports her conviction"; (2) "whether the district court abused its discretion in admitting evidence of the conspirators' communications"; (3) "whether her sentence is procedurally and substantively reasonable"; and, (4) "whether the government failed to disclosed exculpatory evidence." *See Wenxia Man*, 891 F.3d at 1259. The Eleventh Circuit affirmed Movant's judgment of conviction in a lengthy published opinion. *See generally Wenxia Man.*

The instant motion [ECF No. 1] is timely, having been filed before the expiration of the one-year federal limitations period. *See* 28 U.S.C. § 2255(f).

## IV.    Standard of Review

A. <u>Section 2255</u>

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on a final judgment, pursuant to 28 U.S.C. § 2255, are extremely limited. A prisoner is entitled to relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded  the maximum authorized  by law, or (4) is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255(a); *McKay v. United States,* 657 F.3d 1190, 1194 n.8 (11th Cir. 2011). Thus, relief under § 2255 is reserved for transgressions of constitutional rights, and for that narrow compass of other injury that could not have been raised on direct appeal and would, if condoned, result in a

complete miscarriage of justice. *United States v. Frady,* 456 U.S. 152, 165 (1982); *Lynn v. United States,* 365 F.3d 1225, 1232 (11th Cir. 2004)(citations omitted). If a court finds a claim under § 2255 valid, the court "shall vacate and set the judgment aside and shall discharge the prisoner, grant a new trial, or correct the sentence. 28 U.S.C. § 2255. The burden of proof is on the movant, not the government, to establish that vacatur of the conviction or sentence is required. *Beeman v. United States,* 871 F.3d 1215, 1221-1222 (11th Cir. 2017).

B. Ineffective Assistance of Counsel Principles

Where, as here, a defendant challenges counsel's effectiveness, he must demonstrate that: (1) counsel's performance was deficient, and (2) a reasonable probability that the deficient performance prejudiced the defense. *See Strickland v. Washington,* 466 U.S. 668, 687, 694 (1984). However, if the movant cannot meet one of *Strickland*'s prongs, the court does not need to address the other prong. *Strickland,* 466 U.S. at 697; *Brown v. United States,* 720 F.3d 1316 (11th Cir. 2013).

Regarding the performance of appellate counsel, the Sixth Amendment does not require attorneys to press every non-frivolous issue that might be raised on appeal, provided that counsel uses professional judgment in deciding not to raise those issues. *Jones v. Barnes*, 463 U.S. 745, 753-54 (1983). The Supreme Court has recognized that "a brief that raises every colorable issue runs the risk of burying good arguments - those that . . . 'go for the jugular.'" *Id*. at 753. To be effective,

therefore, appellate counsel may select among competing non-frivolous arguments in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Indeed, the practice of "winnowing out" weaker arguments on appeal, so to focus on those that are more likely to prevail, is the "hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986). In considering the reasonableness of an appellate attorney's decision not to raise a particular claim, therefore, this Court must consider "all the circumstances, applying a heavy measure of deference to counsel's judgments." *Eagle v. Linahan*, 279 F.3d 926, 940 (11th Cir. 2001), quoting, *Strickland,* 466 U.S. at 691.

In the context of an ineffective assistance of appellate counsel claim, "prejudice" refers to the reasonable probability that the outcome of the appeal would have been different. *Eagle*, 279 F.3d at 943; *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990). Thus, in determining whether the failure to raise a claim on appeal resulted in prejudice, the courts must review the merits of the omitted claim and, only if it is concluded that it would have had a reasonable probability of success, then can counsel's performance be deemed necessarily prejudicial because it affected the outcome of the appeal.  *Eagle*, 279 F.3d at 943.

## V.    Discussion

In **claim 1**, Movant alleges that both trial and appellate counsel were ineffective when they consented to presenting truncated emails to the jury, which

rendered her entrapment defense ineffective. [ECF No. 1 at 5]. Movant also claims that counsel was ineffective for failing to impeach government witness Matthew McCauley with the actual emails at trial. [*Id.*].

At trial, McCauley testified that he worked for Dependable Component Supply, an international electronic sales company. [CR-ECF 149 at 16]. He previously dealt with Movant because her company was a manufacturer of products that McCauley's company distributed. [*Id*. at 17]. In March of 2011, Movant contacted McCauley to inquire about jet engines, and asked whether it was possible to get them and export them out of the United States. [*Id*. at 19-20]. McCauley told Movant that he could get her the engines, but that they would need to be picked up in the United States because they were military items not able to be exported. [*Id.* at 21-22]. Movant then sent McCauley an email, entered as Exhibit 3, stating that she needed certain engines, and that "[i]f there is any export problem, we have to give up." [*Id*. at 23]. Eventually, in 2012, McCauley contacted Homeland Security Investigations about an unrelated matter, and told them that Man had inquired about exporting military components outside the United States. [*Id*. at 24-25]. At Homeland Security's direction, McCauley contacted Movant via email in September 2012 to see if she was still looking for the engines. [*Id*. at 26]. In that email, entered as Exhibit 4, McCauley told Movant that he had a source for the engines, and that her customer could pick the engines up outside of the United States. [*Id*. at 27].

McCauley did not provide any other information about how the customer could pick up the engines. [*Id*. at 27-28]. Movant responded that she was glad to hear from McCauley and that she would reach out to her customer. [*Id.* at 29]. After some back and forth, Movant responded that her customer still needed the engine, and asked if it could be shipped to Hong Kong. [*Id.* at 33]. At Homeland Security's direction, McCauley advised Movant that it may be easier for them if her customer was put in direct contact with the company who had the engines. [*Id.* at 35]. Movant agreed. [*Id.* at 37]. The two continued to discuss the transaction over the phone and through email. Movant later sent McCauley the following email:

> The buyer is real and the money is from the government, not private party. But you need to make safe the seller is not from the FBI because this morning my husband told me that sometimes the FBI officer disguised to be seller to find spy activities. You and me won't get any trouble.

[CR-ECF 149 at 44-45]. McCauley provided Movant with the contact information for his customer, an undercover agent for Homeland Security. [*Id*. at 54]. Once the undercover agent became involved, McCauley had no further involvement. [*Id*.].

The decision to cross-examine a witness and the manner in which it is conducted are tactical decisions "well within the discretion of a defense attorney." *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (*quoting, Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985)). Moreover, in order to establish prejudice, a habeas petitioner must show at least one "specific instance where cross-examination

arguably could have affected the outcome . . . of the trial." *Id. (quoting Messer*, 760 F.2d at 1090); *see also Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir. 1985) (a defendant's conclusory allegations regarding the testimony of uncalled witnesses are insufficient to state a claim of ineffective assistance of counsel).

As discussed above, in government's Exhibit 4, McCauley told Movant that he had a source for the engines, and that her customer could pick the engines up outside of the United States. [CR-ECF 149 at 27]. When questioned on direct examination, McCauley stated that he did not provide any other information about how the customer could pick up the engines. [*Id*. at 27-28]. Movant now claims that McCauley's testimony that he "did not provide any other information" was false, because the actual email also said "[i]f this deal is still alive, we would need a 50% deposit at the time the order is placed. The balance of the funds would need to be TT'd after your customer reviews the engines at a destination to be determined outside of the USA and before the engines are released to your customer. Please advise your thoughts by returns." [ECF 1 at 5].

Movant does not sufficiently explain why this would have been a key point of impeachment as she continued to pursue conversation with McCauley after the email was sent. Furthermore, counsel did thoroughly cross-examine McCauley. Contrary to Movant's representations in her motion, counsel got McCauley to admit that during the year and a half between the emails (Exhibits 3 and 4), he had no proof of

emails between him and Movant regarding the engines. [ECF 149 at 71]. McCauley also admitted on cross-examination that he did not have any proof that Movant called him to follow up on the deal. [*Id*.]. McCauley admitted that it was only at Homeland Security's direction that he contacted Movant again in 2012. [*Id*. at 73]. All of these facts were purposefully elicited by counsel to show that Movant was entrapped and was otherwise not predisposed to commit the crime.

Given the foregoing, Movant fails to demonstrate how counsel's failure to cross McCauley on the purported "truncated" email would have changed the verdict. The law is clear that movant must show how counsel's failure to cross on that topic affected the outcome of the trial. Because counsel already thoroughly cross-examined McCauley, Movant cannot show that this other minor point of impeachment would have changed the verdict. She cannot establish prejudice. Therefore, Movant's claim should be denied on the merits.[1]

In **claim 2**, Movant alleges that her trial counsel was ineffective for using inaccurate and truncated translations presented to the jury. [ECF 1 at 6]. She claims that she had a witness "Frank Xu" to testify as to the mistranslations, but that her lawyer told her she had to hire a translator to translate the documents at a high cost.

---

[1] To the extent that Movant alleges an ineffective assistance of appellate counsel claim, she fails to provide supporting facts for such a claim. She does not explain what counsel should have argued on appeal. Instead, Movant's claim appears to be based on her trial lawyer's ineffectiveness. Ineffective assistance of trial counsel claims are preferably brought in a § 2255 proceeding like the motion at issue here. *See Massaro v. United States*, 538 U.S. 500, 504 (2003); *see also United States v. Curbelo*, 726 F.3d 1260, 1267 (11th Cir. 2013).

14

[*Id.*]. She further asserts that her lawyer told her the inaccurate translations would not affect the case, so she agreed to stipulate to the accuracy of the government's translations. [*Id.*]. Those inaccurate translations, she claims, did not accurately reflect the "different tones in the conversation" between her and the undercover agent. [*Id.*]. Because Movant herself admits that she stipulated to the accuracy of the government's translations, the essence of her claim is that her lawyer was ineffective for advising her to do so.

> A challenge to translated evidence involves the following:
>
> When a transcript contains a translation of conversations spoken in a foreign language, a qualified witness must authenticate and verify the translation. *See United States v. Llinas*, 603 F.2d, 509-10 (5th Cir. 1979). A party who wishes to challenge the accuracy of a translation bears the burden of presenting another translation so that the jury may choose which version to believe. *United States v. Rosenthal*, 793 F.2d 1214, 1238 (11th Cir. 1986) (citing *Llinas*, 603 F.2d at 509).

*United States v. Fernandez*, 353 F. App'x 363, 375 (11th Cir. 2009). The Eleventh Circuit in *Fernandez* ultimately affirmed the trial court's ruling to admit the translated transcripts because Fernandez failed to identify a single, specific inaccuracy in the translation. *Id.* The requirement that a "defendant identify the inaccuracies of any translated transcripts is likewise applicable to a § 2255 petitioner." *Marquez v. United States*, 2013 WL 12336140, at *19 (S.D. Fla. June 17, 2013) (citing *United States v. Montilla*, 85 F. App'x 227, 230 (2d Cir. 2003)).

As an initial matter, Movant provides no facts to suggest that Frank Xu, the president of the San Diego Asian Equal Civil Right Organization, whom she claims that she wished to call to testify to the "inaccurate" translations, was a qualified witness who could authenticate and verify the translations before the jury. Thus, given the legal requirement that the party challenging the translations retains the burden, contrary to Movant's representations in her motion, it was not unreasonable for counsel to suggest to her that she would need to hire an actual translator to testify in court. Movant admits that she voluntarily declined to do so.

Moreover, there is nothing to suggest that the translations were so explicitly incorrect that the hiring of a translator was necessary to her defense. This is particularly true where Movant merely claims that many of the "mistranslations and omission[s]" were "implicit." [ECF 1 at 6]. Further, her conclusory allegations regarding the "inaccurate" translations are simply insufficient. For example, she claims that the transcripts "were all based on inaccurate translation" and that her intention behind her words was not properly translated. However, she fails to demonstrate how any specific portions of the transcripts were improper or incorrect by pointing to specific words or phrases that were mistranslated.[2] Instead, her qualms

---

[2] Notably, Movant voluntarily and knowingly waived her right to testify [CR-ECF No. 154 at 4-6]. Had she testified, she could have explained her intentions behind her statements to the jury. She also could have explained the alleged omissions in the translations.

with the transcripts appear to be that they do not reflect her intentions. Consequently, she has failed to show that her lawyer's performance was deficient under *Strickland*.

However, even assuming that counsel's performance could be deemed deficient for advising Movant not to challenge the translations and/or omissions at trial, there is nothing in the record to suggest that the outcome at trial would have been different had the translations been contested. This is particularly true where, as found by the Eleventh Circuit, there was "ample evidence [to] establish[] that [Movant] was not merely 'aware of the generally unlawful nature of her actions,' but that she instead conspired to violate the 'known legal duty not to export the [defense articles]' without a license." *Wenxia Man*, 891 F.3d at 1269 (citing *United States v. Adames*, 878 F.2d 1374, 1377 (11th Cir. 1989)). Claim 2 should be denied.

In **claim 3**, Movant alleges her trial counsel was ineffective for failing to effectively question her defense witnesses on her propensity for being "duped" and her unwillingness to violate the law. [ECF 1 at 8]. Specifically, Pastor Guo could have testified that Movant believed a fake missionary who stole money from her, and her husband could have testified as to her being duped by a "single mother's section 8 program and a bank broker's low rate lie" which caused her to lose her two houses. [*Id*.]. Because of this "weakness," Movant easily believed McCauley and the undercover's lies. [*Id*.]. David Andresen, another witness, was also supposed to

testify to her unwillingness to do any controlled product business that would violate export law. [*Id.*].

Complaints of uncalled witnesses are not favored on federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative. *See Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008). "Thus, to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) referencing *Bray v. Quarterman*, 265 F. App'x at 298, and *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

"A decision whether to call a particular witness is generally a question of trial strategy that should seldom be second guessed." *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004). *See also Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995). A petitioner cannot maintain an ineffective assistance of counsel claim "simply by pointing to additional evidence that could have been presented." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 (11th Cir. 2002). Further, trial counsel is not ineffective in failing to call witnesses whose testimony would largely

be cumulative of evidence the jury did hear. *See Johnston v. Singletary*, 162 F.3d 630, 639 (11th Cir. 1998) (counsel was not ineffective for failing to present additional witnesses whose testimony would have been cumulative).

Further, "evidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted). In other words, to successfully assert that trial counsel should have called a witness, a petitioner must first make a sufficient factual showing substantiating the proposed witness testimony. *United States v. Schaflander*, 743 F.2d 714, 721 (9th Cir. 1984).

As an initial matter, Movant fails to provide any witness affidavits to support her claim that the witnesses would have testified as she now claims. She therefore fails to make a sufficient factual showing that the witnesses would have testified consistently with her assertions in her motion, and her claim is subject to dismissal on this basis alone. *See Ashimi*, 932 F.3d at 650.

Moreover, review of the record reveals that counsel presented three defense witnesses: James Guo, David Andresen, and Kenneth Wallace. [CR-ECF 154 at 6]. Pastor James Guo testified that Movant was a congregant of his church in San Diego. [*Id*. at 10]. He testified that he believed she was a law-abiding, honest person. [*Id.*].

19

David Andresen testified that he knew Movant because their children were classmates, and the two entered into an engagement agreement for Movant to possibly sell her business to Maxwell Technologies in San Diego. [*Id*. at 17]. The agreement didn't work out, so Andresen terminated the contract without penalty. [*Id*. at 18]. He testified that through his interactions with Movant, he believed her to be a law-abiding, hard-working person. [*Id*. at 19]. Andresen also testified that Movant wasn't necessarily business-savvy and that she was "a bit innocent as far as how business is done." [*Id*. at 24]. Lastly, Kenneth Wallace testified that he knew Movant through business [*Id.* at 26]. Wallace testified that he worked as an engineer at General Atomics Aeronautical Systems designing and building equipment for the MQ-9 drone, and that Movant never once asked him to get technical data on the drone as that would have been illegal. [*Id*. at 25, 31].

Thus, it is clear from the record above that counsel elicited testimony from multiple witnesses to support Movant's theory of defense:  that she was a law-abiding citizen who was unsophisticated in business, and was easily entrapped into committing the crime. Movant's allegation that her lawyer should have questioned these witnesses in a different manner does not demonstrate that her counsel's performance was deficient because the questions that Movant claims her lawyer should have asked would have been largely cumulative of the evidence that the jury already heard. *See Johnston*, 162 F.3d at 639.

Moreover, counsel's failure to call Movant's husband as a witness does not demonstrate deficient performance. This is particularly true where the purported testimony would have related to Movant's propensity for being "duped." As previously discussed, such testimony regarding Movant's unsophistication in business matters and her general law abiding nature was already elicited through the witnesses called by the defense. Further, Movant's husband, who had an obvious motive to testify in Movant's defense, would have been subject to strenuous cross-examination by the government. Thus, counsel could have made a strategic decision not to call Movant's husband as a witness---such strategic decisions should not be second-guessed by the Court. *See Waters,* 46 F.3d at 1512.

Further, even if counsel had questioned the witnesses in a different manner and had presented Movant's husband as a witness, there is nothing to suggest that the outcome at trial would have been different. Here, the jury expressly rejected Movant's theory of defense, and convicted Movant in light of the overwhelming evidence against her, including the testimony from the undercover agent that Movant intended to illegally broker defense articles for China. In light of this evidence, Movant cannot demonstrate that the outcome at trial would have been different had counsel presented the different testimony that would have been largely cumulative of the defense already rejected by the jury. Therefore, she fails to meet the second prong of *Strickland*, and this claim should be rejected.

In **claim 4**, Movant alleges that trial counsel was ineffective when he failed to present exculpatory evidence showing Movant's explicit unwillingness to violate export law. [ECF 1 at 9]. Movant also claims that counsel should have presented emails between her and her co-conspirator, Zhang, to show that there was no agreement. [*Id.*]. Instead, she asserts, that the emails she sent to Zhang were of a religious nature, and "Gospel of Christ Jesus only." [*Id.*].

To establish a conspiracy, the government must prove "(1) [an] agreement between two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement." *United States v. Broughton*, 689 F.3d 1260, 1277 (11th Cir. 2012). The two people who agree to commit the crime cannot be government agents or informants. *United States v. Elledge*, 723 F.2d 864, 866 (11th Cir. 1984); *United States v. Wright*, 63 F.3d 1067, 1072 (11th Cir. 1995). It is also legally impossible for a defendant to conspire with a government agent or informant who actually aims to frustrate the conspiracy. *See United States v. Arbane*, 446 F.3d 1223, 1228 (11th Cir. 2006); *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989). However, "[i]nferences from the conduct of the alleged participants or from other circumstantial evidence of a scheme may provide the basis for establishing that a conspiratorial agreement existed." *Battle,* 892 F.2d at 999. Likewise, conversations

between the defendant and government agent or informant may constitute evidence

of a conspiracy between the defendant and another. *Elledge*, 723 F.2d at 866.

Here, review of the record reveals that there was more than sufficient evidence

of a conspiratorial agreement between Movant and Zhang. Particularly, when

Movant previously challenged the sufficiency of the evidence on direct appeal, the

Eleventh Circuit noted the following:

> Sufficient evidence establishes that Man and Zhang agreed to export
> unlawfully the items charged in the indictment and that this agreement
> was not wholly conditioned on Liu's participation. To be sure, Zhang
> never reached a final, definite agreement with Liu. But the record
> supports the reasonable inference that Man and Zhang reached an
> independent agreement to acquire the engines and drones from any
> available source and that the duo "would have maintained [a]
> partnership or joint venture" in addition to "the one [that they]
> propos[ed] to [Liu]." *Id*. at 1003. Indeed, the search for a supplier began
> before Man and Zhang became aware of Liu. After Man received an
> email from the "hrkj2006" account that instructed her to locate military
> engines, she aimed her initial inquiries at McCauley. And when
> McCauley recommended Liu, Man readily redirected her efforts.
>
> The conspirators' statements when the deal fell apart also evidence that
> Man and Zhang intended to find an alternative participant for their
> scheme. Zhang told Liu that he remained "very eager[ ] ... to do [the
> deal]" and did not "have any financial issues." He explained that he did
> not intend to make a purchase from Liu because he was "concerned that
> [Liu] could not deliver in the condition [he] want[ed]." Indeed, Zhang
> suggested in the same conversation that he might be willing to negotiate
> new terms if Liu would meet him in Taiwan or Hong Kong. This
> persistence was sufficient to allow a reasonable jury to infer that Man
> and Zhang's agreement to obtain the drones and engines was not wholly
> dependent on Liu and that the conspirators had "agreed to submit to
> [different potential sellers] proposals other than the ones they submitted
> to [Liu]." *Id*. In short, the evidence of extensive negotiations and
> plotting establishes far more than a "half-baked" plan, and that Man and

Zhang's attempt to acquire the contraband from Liu ultimately proved "impossib[le] is no defense." *Id.* at 1002.

Evidence of an ongoing and close relationship between Man and Zhang during their search for a supplier also supports the inference that they reached an independent and sufficiently definite agreement to export the relevant items unlawfully. Man brokered the connection between Liu and Zhang and provided Liu with Zhang's email address and phone number. And in her discussions with Liu, Man frequently relayed inquiries and demands from Zhang, such as his interest in the drone and specific engine models. She also provided Liu with detailed information about Zhang, such as that he worked for the Chinese military, was a "tech[nology] spy," and was "a night owl." And she told Liu about Zhang's concern that "the phone calls in the [United States were] under surveillance." A reasonable jury could find that Liu was not a necessary part of Man and Zhang's relationship and agreement.

*Wenxia Man*, 891 F.3d at 1267.

Given the foregoing, Movant's challenge to the sufficiency of the evidence against her, now under the guise of ineffective assistance of counsel, does not warrant a different result. *See Hobson v. United States*, 825 F.2d 364, 366 (11th Cir. 1987) (claim raised and considered on direct appeal precludes further review of the claim in a § 2255 motion), *vacated on other grounds*, 492 U.S. 913 (1989); *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000).

Furthermore, to the extent that Movant suggests that her lawyer should have presented other evidence to show that she had no agreement with Zhang to export articles unlawfully, she provides no facts to suggest that such evidence would have overcome the mountain of other evidence against her, as discussed by the Eleventh Circuit. Particularly, contrary to Movant's representations in her motion, there was

an ongoing and close relationship between Man and Zhang while they attempted to broker the deal with the undercover agent. The relationship between the two of them clearly extended beyond "Christianity articles" as she now claims. Thus, Movant fails to demonstrate any prejudice under the second prong of *Strickland*, and her claim should be denied.

## VI. Cautionary Instruction Re Clisby Rule

The Court is mindful of the *Clisby*[3] rule that requires district courts to address and resolve all claims raised in habeas corpus proceedings, regardless of whether relief is granted or denied. *Clisby v. Jones*, 960 F.2d at 936-36; *Rhode v. United States,* 583 F.3d 1289, 1291 (11th Cir. 2009) (holding that *Clisby* applies to § 2255 proceedings). However, nothing in *Clisby* requires, much less suggests, consideration of claims or arguments raised for the first time in objections. If the Movant attempts to raise arguments or further factual support for his claims in objections, the court should exercise its broad discretion and refuse to consider the arguments not raised before the magistrate judge in the first instance. *See Williams v. McNeil,* 557 F.3d 1287 (11th Cir. 2009) (*citing Stephens v. Tolbert,* 471 F.3d 1173, 1175 (11th Cir. 2006) (finding no abuse of discretion by the district court in declining to consider timeliness argument that was not presented to the magistrate judge)). This is so because "[P]arties must take before the magistrate, 'not only their best

---

[3]*Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992).

shot but all of the shots.'" *See Borden v. Sec'y of Health & Human Services*, 836 F.2d 4, 6 (1st Cir. 1987) (*quoting Singh v. Superintending School Committee of City of Portland*, 593 F. Supp. 1315, 1318 (D. Me. Sept. 27, 1984). Further, where a precise argument, subsumed within any of the foregoing grounds for relief, was not specifically addressed herein, all arguments and claims were considered and found to be devoid of merit, even if not discussed in detail here.

## VII.   Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the Movant to establish the need for a federal evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.,* 647 F.3d 1057, 1060 (11th Cir. 2011). To determine whether an evidentiary hearing is needed, the question is whether the alleged facts, when taken as true, are not refuted by the record and may entitle a petitioner to relief. *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016), *cert. den'd*, 137 S. Ct. 2245 (2017). The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [petitioner's] claim[s] without further factual development," *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing is not warranted here. *See Schriro v. Landrigan,* 550 U.S. 465, 473-75 (2007); *Holmes v. United States,* 876 F.2d 1545, 1553 (11th Cir. 1989).

## VIII.  Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his § 2255 has no absolute entitlement to appeal, and to do so, must obtain a certificate of appealability ("COA"). See 28 U.S.C. § 2253(c)(1); *Harbison v. Bell,* 556 U.S. 180, 183 (2009). This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel,* 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Upon consideration of the record as a whole, this Court should deny a certificate of appealability. Notwithstanding, if the Movant does not agree, she may bring this argument to the attention of the district judge in objections.

## IX.    Recommendations

Based on the foregoing, it is recommended that:

1.      the motion to vacate be DENIED on the merits;

2.      final judgment be entered in favor of the respondent;

3.      that no certificate of appealability issue; and,

4.      the case CLOSED.

Any party who objects to this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the Clerk of this court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge. *See* 28 U.S.C.§ 636(b)(1)(C); *Thomas v. Arn,* 474 U.S. 140, 149 (1985).

Signed this 27th day of March, 2020.

UNITED STATES MAGISTRATE JUDGE

cc:     Wenxia Man
        12658 Torrey Bluff Drive
        Apt 287
        San Diego, CA 92130
        PRO SE

        Marc Stuart Anton
        United States Attorney's Office
        500 East Broward Blvd.
        Suite 700
        Ft. Lauderdale, FL 33394
        954-660-5096
        Fax: 954-356-7230

Email: marc.anton@usdoj.gov